## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## ASHLAND

**CIVIL ACTION NO. 04-158-HRW**

**IN RE HNRC DISSOLUTION CO. f/k/a HORIZON NATURAL RESOURCES COMPANY, ET AL**

**UNITED MINE WORKERS OF AMERICA**                              **APPELLANT,**

**v.**                              **MEMORANDUM OPINION AND ORDER**

**MIDWEST COAL CORP., et al.,**                              **APPELLEES.**

* * * * * * * *

This matter is before the Court upon the Appellees' Motions to Dismiss [Record Nos. 37, 39, 45]. The Court, having reviewed the record and being otherwise sufficiently advised, hereby sustains the Appellees' motions.

*FACTS:*

This matter involves eight appeals arising out of the voluntary Chapter 11 bankruptcy of Horizon Natural Resources Company and several of its direct and indirect subsidiaries and affiliates (collectively, "Debtors").[1] The Debtors were a group of affiliated companies engaged in the mining and marketing of coal for

---

[1]      Four appeals – 04-158, 04-159, 04-160, 04-171 – were filed on September 7, 2004, from the Bankruptcy Court's §§ 1113 and 1114 Orders. The remaining appeals – 04-194 through 04-197 – arise from the Bankruptcy Court's Sale Order and Confirmation Orders.

steam production. They filed for bankruptcy on November 13-14, 2002, in the United States Bankruptcy Court for the Eastern District of Kentucky.

The instant appeals were filed by: the United Mine Workers of America ("UMWA"), the UMWA 1950 Pension Trust and the UMWA 1974 Pension Trust (the "Pension Trusts"), and the UMWA 1992 Benefit Plan and its Trustees and the UMWA Combined Benefit Fund and its Trustees (the "Coal Act Funds") (collectively, the "Unions"). The Unions appeal from the Bankruptcy Court's Sale and Confirmation Orders as well as three §§ 1113/1114 Orders, having bearing on the Debtors obligation to provide lifetime retiree and health benefits to their employees. Specifically, the Debtors were required to pay medical benefits to coal miner retirees and their families under the Coal Industry Retiree Health Benefit Act of 1992 (the "Coal Act"), and ten unionized Debtors were bound by collective bargaining agreements ("CBAs") with the UMWA.

Eight of the Debtors were signatory to the National Bituminous Coal Wage Agreement of 2002, and two other Debtors were bound by separate collective bargaining agreements ("CBAs") with the UMWA. Each CBA contained a "successorship clause" whereby the employer agreed not to sell its operations without obtaining the purchaser's agreement to assume the employer's obligations

under the agreement.[2] Pursuant to the successorship clause, the unionized Debtors, in concert with other employers in the bituminous coal industry, were required to guarantee the continued provision of benefits from the Pension Trusts. The Pension Trusts are multi-employer pension plans that provide benefits to thousands of miners, including miners who last worked before 1978, while the 1974 Pension Trust provides benefits to miners who retired after 1975 and miners who have yet to retire.

For over a year, the Debtors negotiated with the Unions to eliminate their obligations to provide lifetime retiree and health benefits to their employees – to no avail. Faced with continuing financial difficulties, the Debtors determined that a reorganization of their business as a going concern was no longer feasible, and they decided to sell substantially all of their assets through confirmed Chapter 11 plans. To satisfy the requirements of § 1129 of the Bankruptcy Code and confirm the plans, the Debtors had to find a buyer or buyers for their assets who would submit a bid in an amount sufficient to pay all senior secured and administrative expense claims in full. *See*, 11 U.S.C. §§ 1129(a)(9), (b)(2)(A). However, in the course of marketing the Debtors' assets, the Debtors' investment bankers had

---

[2]     The Debtors employ approximately 2,500 individuals, about 800 of which are represented by the Union. Of the ten Union Debtors, only four have active mining operations.

determined that prospective buyers were not interested in purchasing the assets unless they were transferred free and clear of all obligations under the Coal Act and CBAs.

In March 2004, certain Debtors filed their joint "Reorganization Plan" and joint "Liquidating Plan" (collectively, "the Plans"). The Plans provided for the sale of substantially all of the Debtors' assets and contemplated using the proceeds to pay obligations to the post petition lenders, administrative expenses not assumed by the purchasers, and certain other claims. The Plans also anticipated an order from the Bankruptcy Court authorizing the sale of the Debtors' assets free and clear of all liens, claims, encumbrances, and other interests, including successor liability under CBAs and under the Coal Act. On June 16, the Bankruptcy Court approved the Plans, which scheduled an auction for August 17, 2004, and a hearing on confirmation and approval of the sale for August 31, 2004.

In the interim, on July 6, 2004, certain Debtors moved the Bankruptcy Court for orders allowing them to reject their CBAs with the Unions pursuant to § 1113 of the Bankruptcy Code, and to modify certain union retiree benefit plans and Coal Act union retiree benefit plans under § 1114 of the Bankruptcy Code. On August 6, 1994, the Bankruptcy Court issued a memorandum opinion and entered three orders granting the §§ 1113 and 1114 Motions (the "§§ 1113/1114 Orders"). The

Bankruptcy Court specifically found that the Chapter 11 plans could not be confirmed and consummated without the requested relief. Although the Unions timely appealed from the §§ 1113/1114 orders,[3] they never sought a stay of the effectiveness of those orders.

The Debtors auctioned their assets on August 17, 2004, free and clear of any obligation to pay retiree benefits. "Totalco," placed the highest bid.[4] Totalco was comprised of Oldcoal, LLC, as Appellee Lexington Coal Co. was then known; Newcoal, LLC, as Appellee ICG was then known; and A.T. Massey Coal Company. On August 31, the Bankruptcy Court orally approved the sale and confirmed the Plans, thereby overruling the objections of the UMWA, the Coal Act funds, and the Pension Trusts.

On September 13, 2004, before the written order was entered, the Coal Act Funds filed a motion in the Bankruptcy Court to stay the orders pending appeal. The Bankruptcy Court denied the Coal Act Fund's motion to stay at a hearing on September 16, 2004 (the Court entered the written order on September 23, 2004), and entered an order approving the sale of substantially all of the Debtors assets,

---

[3]       *See* Consolidated Case No. 04-cv-158.

[4]       Totalco purchased the assets for $786 million dollars, of which $304 million was in cash, and $482 million was a credit bid of debts held by the Second-Tier Noteholders. Apparently, both Newcoal and Oldcoal include a majority of the Debtors' Second-Tier Noteholders.

free and clear of all liens, claims, and other encumbrances (the "Sale Order").  On
September 17, 2004, the Bankruptcy Court entered an order confirming the
Debtors' Third Amended Plan of Reorganization and an order confirming the
Debtors' Third Amended Liquidating Plan (collectively, the "Confirmation
Orders").

The Unions filed their notices of appeal from the entry of the Sale and
Confirmation Orders with this Court on approximately September 22, 2004.  Then,
on September 23, 2004, the Coal Act Funds filed with the Court a motion to
temporarily stay the effectiveness of the Sale Order and the Confirmation Orders
and a motion for expedited consideration and a temporary injunction.  The
UMWA and the Pension Trusts did not file separate applications for a stay.  The
Court entered an order granting the Unions a temporary stay of the Sales and
Confirmation Orders on September 28, 2004.[5]

---

[5]      During the pendency of the district court proceedings, the appellants also sought a
stay of the effectiveness of the Confirmation Orders and Sale Order from the Sixth Circuit.  On
September 27, 2004, while the application for a stay was pending in this Court, the Appellants
applied to the Sixth Circuit for an emergency stay.  The Appellants stated in their Petition for
Emergency Injunction:

> The consummation of the sale, which would transfer substantially all of the
> Debtors' assets to their creditor purchasers free and clear of their obligations
> under the Coal Act, would moot the Appellants' appeal to this Court.

When the Sixth Circuit did not rule on that application, the Appellants filed a second application
for emergency stay with the Sixth Circuit on September 29, 2004.  Although the Sixth Circuit
requested responsive briefs on that application, it did not take any action.  On October 1, 2004,

At a hearing on September 30, 2004, the Debtors represented to the Court that if the stay were held in place, the sale would likely collapse. The Court therefore informed the Unions that it would not consider staying the Sale and Confirmation orders unless they were willing to post bond of at least $500,000,000.00. The Unions refused to do so. Accordingly, the Court lifted the temporary stay and denied the Unions' Motions to Stay the Sale Order and the Confirmation Orders pending appeal.

After the Court lifted the stay on September 30, 2004, the Debtors completed the sale and transferred substantially all of their assets free and clear of all claims, encumbrances, and interests, and the Plans became effective. The Debtors then dissolved in accordance with the Confirmation Orders and proceeds of the sale were distributed under the Plans to creditors and to the liquidating trustee, Geoffrey L. Berman. That same day, the Unions filed a Notice of Appeal with the Sixth Circuit. However, the Unions voluntarily dismissed their appeal on October 14, 2004 [Record No. 21].

Appellees, Lexington Coal Company, LLC, International Coal Group, Inc., Geoffrey L. Berman, and Deutsche Bank Trust Company, have now filed Motions

---

the Debtors filed a suggestion of mootness due to the closing of the Asset Sale and the occurrence of the effective date of the Plans. The Unions voluntarily dismissed their applications for an emergency stay on October 12, 2004 [Record No. 20].

to Dismiss the Unions' claims as statutorily moot under 11 U.S.C. § 363(m) of the Bankruptcy Code as well as the doctrine of equitable mootness.

For the reasons set forth more fully herein, the Court concludes that the Unions' bankruptcy appeals are moot under 11 U.S.C. § 363(m) of the Bankruptcy Code and the doctrine of equitable mootness. Accordingly, the Court will sustain the Appellees' Motions to Dismiss.

## *STANDARD OF REVIEW:*

This Court reviews the Bankruptcy Court's conclusions of law de novo and upholds its findings of fact unless they are clearly erroneous. *See, In re 255 Park Plaza Assocs. Ltd. P'ship*, 100 F.3d 1214, 1216 (6th Cir. 1996). The Bankruptcy Court's findings of fact are not clearly erroneous unless there is the "most cogent evidence of mistake or miscarriage of justice." *In re Johnson*, 845 F.2d 1395, 1400 (6th Cir. 1988).

## *ANALYSIS:*

The Appellees argue that the appeals should be dismissed for lack of jurisdiction because: (1) the appeals of the Sale Order are moot under § 363(m) of the Bankruptcy Code; (2) the appeals of the Confirmation Orders are equitably moot because the Plans have been substantially consummated and piecemeal modification is neither possible nor desirable; and (3) the appeals of the §§ 1113

and 1114 Orders are equitably moot and no remedy is available. The Court will address each of these arguments in turn.

First, Appellees argue that the appeals from the entry of the Sale Order should be dismissed because they are moot under § 363(m) of the Bankruptcy Code, which provides that:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not the entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). The Sixth Circuit recognizes that § 363(m) renders a bankruptcy appeal moot once a sale has been completed to a good faith purchaser unless the appellant obtains a stay of the sale pending appeal. *In re 255 Park Plaza, supra* at 1216; *See also, Church of Scientology v. US*, 506 U.S. 9, 12, 113 S.Ct. 447 (1992). According to Appellees, § 363(m) applies to moot the Unions' appeals from the Sale Order because the buyers purchased Horizons' assets in good faith, and the Unions failed to obtain a stay pending their appeals, as required by § 363(m).

From the outset, the Court notes that it is undisputed fact that the Unions did not *obtain* a stay of the Sale Order so as to invoke the exception to mootness

-9-

found within the statute. Even though the Unions requested a stay from the Bankruptcy Court as well as this Court, their requests were denied.[6] This Court denied the Unions' request because the Unions were unwilling to post a bond of at least $500,000,000.00, despite their representations that the sale would likely collapse if the temporary stay was held in place. While the Unions appealed this Court's denial of their request for a permanent stay, they voluntarily dismissed that appeal on October 14, 2004 [Record No. 21].

Appellants also applied to the Sixth Circuit for an emergency stay with the Sixth Circuit on September 27, 2004, while the application for a stay was pending in this Court. When the Sixth Circuit did not rule on that application, the Appellants filed a second application for emergency stay with the Sixth Circuit on September 30, 2004. The Sixth Circuit requested responsive briefs on that application but did not take any action. The Unions voluntarily dismissed their applications on October 12, 2004 [Record No. 20].

The Court concludes that the Unions cannot invoke the exception found

---

[6] Neither the UMWA nor the Pension Trusts requested a stay. The UMWA contends that its failure to bring their own application for a stay should not moot the appeals because they knew they would not be able to post the bond, and in fact, could not post a $500 million bond (due to its fiduciary duties to other members). Moreover, it asserts that the Debtors own conduct (delay in bringing the §§ 1113 and 1114 motions) foreclosed appeals prior to confirmation of the plan and sale. The Court declines to address these arguments, as the express language of the statute requires that a party obtain a stay, notwithstanding any excuses for failing to do so.

within § 363(m), as the Unions merely sought to stay the orders pending appeal. All such efforts were denied in turn by the Bankruptcy Court, this Court, and the Sixth Circuit.  As correctly noted by the Appellees, under the express language of § 363(m), requesting a stay is not the same as obtaining a stay.

Moreover, the Court declines to accept the Unions' argument that their failure to obtain a stay was due to the Debtors' conduct  -- to the contrary, the record reveals that the Unions received timely hearings in the Bankruptcy Court and in this Court.  The Unions were simply unwilling to post bond.

Accordingly, because the Unions did not obtain a stay pending appeal and the Debtors' assets were sold pursuant to the Plans, the only issue remaining issue under § 363(m) is whether the buyers were acting in good faith as required by § 363(m).[7]  "It is undisputed that the mootness rule only operates to bar an appeal when a purchaser buys property in good faith." *In re Second Grand Traverse School*, 2004 WL 1262547, 100 Fed.Appx. 430 (6th Cir. 2004).  Though the bankruptcy code itself does not define the term "good faith purchaser," courts

_____

[7]        From the outset, the Court rejects Appellants' argument that any inquiry by the Court into the purchaser's good faith is tantamount to addressing the case on the merits.  Rather, as correctly pointed out by Appellees, mootness is a threshold issue that must be addressed before the merits. *In re Jamison*, 1994 WL 284114 (6th Cir. 1994).  Courts routinely consider the issue of good faith when determining whether § 363(m) applies. *In re Tempo Tech. Corp.*, 202 B.R. 363, 367 ("Thus, where the good faith of the purchaser is at issue, the district court is required to review the bankruptcy court's finding of good faith before dismissing any subsequent appeal as moot under section 363(m)").

-11-

have adopted the "traditional equitable definition of a 'good faith purchaser,'"

defined as "one who purchases the assets for value, in good faith, and without

notice of adverse claims." *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1197 (7th

Cir. 1978).  Thus, to be covered under the statutory protection of § 363(m), the

buyers must have purchased the property "in good faith" and "for value." *In re*

*Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147 (3rd Cir. 1986).

The Court can determine the good faith issue based solely on the record of

the Bankruptcy Court. *In re 255 Park Plaza, supra* at 1218 (rejecting appellants'

argument that appeal was not moot based on fact that purchaser did not act in bad

faith because "nothing in the record indicates that such [bad faith] allegations

would be warranted."); *In re Second Grand Traverse School, supra* at 433-34

("Merely raising the issue of bad faith in its appeal before the district court, did

not preclude the district court from concluding that § 363(m) applies.  The district

court, having reviewed the record of the bankruptcy court, concluded there was

sufficient evidence of the good faith of the purchaser.").

In this matter, the Bankruptcy Court specifically found at the Confirmation

Hearing, based on the evidence of record, that the "combined buyers are a good

-12-

faith purchaser under the terms of Section 363."[8]  The Unions contend that this

finding is unsupported by the evidence of record and argue that the purchasers

were in bad faith.  However, the Sixth Circuit has held that "to show a lack of

good faith, the debtor must demonstrate that there was fraud or collusion between

the purchaser and the seller or the other bidders, or that the purchaser's actions

constituted 'an attempt to take grossly unfair advantage of other bidders.'" *In re

255 Park Plaza, supra* at 1218.  Where the appellant fails to meet that burden and

nothing in the record indicates that such allegations are true, the appeal should be

dismissed as moot. *Id.*

　　The Court concludes that the Unions have failed to meet its burden.

According to the Unions, the sale was not in good faith because: (1) collusion

between the Debtors and purchasers (the Debtors' Second-Tier Noteholders)

created an insider deal which was grossly unfair to other bidders, and thus,

constituted a suspect transaction under 363(m); and (2) even if the negotiations

were at arms length, the Debtors and purchasers were motivated by a "principal

purpose" to avoid Coal Act obligations and manipulated the sale structure to do

---

　　[8]　　*See also*, the Sale Order, "The auction process was non-collusive, fair and
reasonable, conducted in good faith, and resulted in the Debtors obtaining the highest value for
the purchaser assets."  The Bankruptcy Court's conclusion that the buyers were a good faith
purchaser is a mixed question of law and fact. *Licensing by Paolo, Inc. v. Sinatra (In re Gucci)*,
126 F.3d 380, 390 (2d Cir. 1997).

-13-

so, which a type of "sham transaction" the Coal Act was designed to deter.

The Appellants have cited no evidence in the record to establish that either the process of selling the property or the purchasers actions were tainted by fraud or collusion. The fact that some of the buyers were also holders of second-tier notes issued by the Debtors does not preclude a finding of good faith because section § 363(k) expressly permits lien holders to bid in their liens to purchase assets in a bankruptcy sale. Having reviewed the record, the Court concludes that there is sufficient evidence to support the Bankruptcy Court's holding that the purchasers acted in good faith, were not insiders, and that the Debtors received fair value for the assets. The Unions have presented no evidence to the contrary.

The Appellants, having failed to adduce any evidence that fraud or collusion tainted the sale of the property in question, cannot rely on mere conclusory allegations to establish bad faith. *See, In re Second Grand Traverse School, supra*; *255 Park Plaza, supra* at 1218 (holding that an appeal was moot under section 363(m) despite the appellant's bad faith allegation where the bankruptcy court had explicitly found purchasers acted in good faith). Because there was substantial evidence supporting the Bankruptcy Court's determination of good faith and the Unions did not produce any contradictory evidence in the Bankruptcy Court, the Court concludes that the Bankruptcy Court's findings that the purchasers were

acting in good faith and that the Debtors received fair value is not clearly erroneous.

The Court is unpersuaded by the Unions' argument that § 363(m) does not apply to moot their appeals of the Sale Order because the "capable of repetition, yet evading review" exception applies. The Sixth Circuit has identified two factors that must be considered in determining whether an issue is "capable of repetition, yet evading review": (1) whether "there is a reasonable expectation that the same complaining party would be subject to the same action again," and (2) "if the challenged action is to short in duration to be fully litigated prior to its cessation or expiration. *In re Commerce Oil*, 847 F.2d 291, 293 (6th Cir. 1988).

According to the Unions, the "capable of repetition" prong is met because they will face this type of action as other signatory coal operators follow the debtors' "blueprint" to avoid Coal Act liability and "dump their retirees on other operators in the plans." They argue that the "evading review" prong of the test is met because: (1) the sale strategy employed by the Debtors permits the sale to close in too short a duration for the underlying Coal Act issues to be fully litigated; and, (2) it is unlikely that the Trustees could post a bond for hundreds of millions of dollars to forestall the closure of the sale through a stay pending appeal.

-15-

The Court disagrees.  The Court does not dispute that bankruptcy sales often proceed on an expedited basis.  Nor does it dispute that Appellants' legal arguments will likely rise again in future bankruptcy actions.  Nevertheless, the Court cannot agree that the issue raised in the present action is "evading review" in the sense necessary to avoid mootness under § 363(m).  At a minimum, Appellants failure to obtain a stay from this Court, pursuant to Bankruptcy Rule 8005, prevents it from establishing that the legal issue raised on appeal evaded review because of "the intrinsically elusive nature of the action,"as required to avoid a finding of mootness. *Reed v. United States*, 758 F.2d 653, 1085 WL 12967 (6th Cir. 1985) (unpublished) ("The instant cause evades review not because of the intrinsically elusive nature of the action, but because a stay of enforcement was not sought in the district court.").  An issue does not evade review where legal avenues are available, including the ability to obtain a stay, but a party fails to utilize them. *In re White's Furniture*, Case No. C2–00-796, slip op. (S.D. Ohio March 2, 2001).  Here, the Court afforded the Unions ample opportunity to obtain a stay, which they failed to utilize.

Further, as noted by the Defendant, when the suit involves private parties, "the complaining party must show a reasonable expectation that he would again be subjected to the same action by the *same* defendant." *Chirco v. Gateway Oaks,*

*L.L.C.*, 384 F. 2d 307, 309 (6th Cir. 2004). In the instant case, the Court finds that the sale is not "capable of repetition" because the "defendant" in the confirmation of the Plans was the Debtors, who have dissolved. Accordingly, the Court concludes that the "capable of repetition, yet evading review" exception does not apply to salvage the Union appeals from the Sale Order.

Accordingly, because the purchasers were acting in good faith and the Unions failed to obtain a stay of the Sales Order entered by the Bankruptcy Court, the Court concludes that the Union appeals from the Bankruptcy Court's entry of the Sales Order are statutorily moot under § 363(m) of the Bankruptcy Code.[9]

The Court now turns to Appellees' contention that the Union appeals from the entry of the Confirmation Orders and the §§ 1113/1114 Orders should be dismissed pursuant to the doctrine of equitable mootness. Under the doctrine of equitable mootness, "'a plan of reorganization, once implemented, should be disturbed only for compelling reasons.'" *City of Covington v. Covington Landing Ltd. Partnership*, 71 F.3d 1221, 1225 (6th Cir. 1995), quoting *In re UNR Indus., Inc,*, 20 F.3d 766, 769 (7th Cir. 1994). In determining whether an appeal is equitably moot, the Sixth Circuit and other courts analyze three factors: (1)

---

[9] In light of the Court's holding that the Union appeals from the Sale Order are statutorily moot, the Court finds it unnecessary to address whether the Union appeals from the Sale Order are equitably moot.

whether a stay was obtained; (2) whether the plan has been "substantially consummated"; and (3) whether the relief requested would affect either the right of parties not before the court or the success of the plan. *In re Eagle Picher Indus., Inc.*, Case Nos. 96-4309, 97-4260, 1998 WL 939869, p. 4 n.8 (6th Cir. 1998) (Unpublished Opinion), citing *Matter of Manges*, 29 F.3d 1034 (5th Cir. 1994); *UNR Indus., supra* at 769 (citing cases from the Second, Seventh, Ninth, Eleventh and D.C. Circuits).[10]  Appellees maintain that the Union appeals from the Confirmation Orders and §§ 1113/1114 Order are moot under the foregoing three-part test.

The Court concludes that the first prong of the test is satisfied, in that the Unions' failed to obtain a stay.  It is an important policy of bankruptcy law that

---

[10]      As it is unsupported by legal authority, the Court rejects the test cited by the Coal Act Funds for determining whether an appeal from the entry of a Confirmation Order should be dismissed based on the doctrine of equitable mootness.  Specifically, the Coal Act Funds urge the Court to, first, analyze the facts and circumstances of the pending appeals, keeping in mind certain prudential considerations, including: the conduct of the party seeking appellate review, such as efforts to obtain a stay; the conduct of the party invoking equitable mootness; the degree to which granting relief would undermine the expectations of innocent parties; whether the appeal challenges the subject matter jurisdiction of the Bankruptcy Court to enter the Orders challenged on appeal; and for each appeal, whether there is at least one form of relief available if the appeal is successful.  Second, the Coal Act Funds urge the Court to determine for each appeal whether any relief is available, even if partial, that would be prudent under the facts and circumstances if the appeal were successful. They cite *City of Covington v. Covington Landing Ltd. P'ship*, 71 F.3d 1221, 1225-26 (6th Cir. 1995) and *In re Arbors of Houston Assoc. Ltd. P'ship*, 1999 WL 17649, at 2.  However, those cases do not specifically reference this test, much less the five factor prudential considerations formulated by the Coal Act Funds.  Accordingly, the Court declines to apply it.

-18-

court-approved reorganization plans be able to go forward unless a stay is obtained. *Bennett v. Veale*, 60 F.3d 828, 1995 WL 385147, p. 2 (6th Cir. 1995). While the failure to seek a stay is not determinative, it is highly relevant. *Id.* A party that elects not to pursue a stay bears the risk that a speedy implementation of a confirmation order will moot their appeal. *See, Specialty Equip.*, 3 F.3d at 1047.

The Unions argue that they diligently sought stays, and that Appellees engaged in delay tactics to prevent them from obtaining a stay, while trying to close the sale on the sly. The Court finds this argument to be without merit. "A stay not sought, and a stay sought and denied, lead equally to the implementation of the plan." *UNR Indus., supra* at 769. The Unions never even applied for a stay of the §§ 1113/1114 Orders. Moreover, the Court afforded the Unions their day in court with regard to their application for a stay of the Confirmation and Sale Orders – but they did not obtain a stay from those orders because they were unwilling to post bond, not because of any "delay tactics" by the Appellees. As such, they assumed the risk that the Plans would be substantially consummated in advance of any appeal of the Confirmation Orders or the §§ 1113/1114 Orders. Accordingly, the Court finds that the Appellants' failure to obtain a stay, while not determinative, nonetheless weighs in favor of rendering their Appeals from the Confirmation Orders and §§ 1113/1114 Orders moot.

Appellees argue that the Plans have been substantially consummated in this matter. The Court agrees. The foremost consideration in determining whether an appeal should be dismissed as moot is whether the reorganization plan has been substantially consummated. *In re Genesis Health Ventures, Inc.*, 280 B.R. 339, 343 (D. Del. 2002), quoting (*In re PWS Holding Corp.*, 228 F.3d 224, 236 (3rd Cir. 2000). Substantial consummation is defined in § 1101(2) of the Bankruptcy Code as a: (1) transfer of all or substantially all of the property proposed by the plan to be transferred; (2) assumption by the debtor or by the successor to the debtor under the plan of the business or the management of all or substantially all of the property dealt with by the plan; and (3) commencement of distribution under the plan. 11 U.S.C. § 1101(2). Substantial consummation of a plan "raises a presumption that the appeal is moot and should be dismissed." *Eagle Picher, supra* at 4; *In re Blue Diamond Coal Co.*, 160 B.R. 574 (E.D. Tenn. 1993).

As noted by Appellees, the asset sale is complete, and the Debtors have dissolved. Appellees also point out that the Plans have been substantially consummated since the asset sale and effective date for the following reasons: (a) the Buyers are operating the Debtors' former coal mines; (b) the Buyers have assumed the Debtors' contracts, leases, administrative expenses, as well as reclamation and environmental liabilities and have absorbed the assets; (c) the

-20-

proceeds of the sale have been used to pay substantially all of the creditors, including approximately $300 million in administrative claims to various creditors and over $200 million in debtor-in-possession financing extended by Deutsche Bank on the Bankruptcy Court's approval; (d) the liquidating trustee has distributed valuable equity rights and other dividends to the Debtors' second and third-tier secured creditors; (e) the Debtors' estates have released causes of action that would otherwise have augmented potential recoveries for unsecured creditors; (f) the Liquidating Trust was created to pursue causes of action for its beneficiaries, the holders of allowed unsecured claims against the Debtor's estates, and the Liquidating Trustee has filed over 600 avoidance action complaints against third parties.

Based on the foregoing, the Court finds that the Debtors have transferred substantially all of the property proposed by the plan, and the successors have assumed the management of all or substantially all of the property dealt with by the plan. Likewise, the Court finds that distribution has commenced under the plan. As the only tasks remaining are for the Liquidating Trust to oversee various litigation and tax matters, prosecute avoidance actions on behalf of the remaining creditors, complete these appeals, and complete any distributions to the unsecured creditors, including the Unions, the Court concludes that the Plans have been

-21-

substantially consummated and the second prong of the equitable mootness test is satisfied. Thus, the substantial consummation of the Plans "raises a presumption that the appeal is moot and should be dismissed."

Having determined that the Plans have been substantially consummated, the Court must determine whether the third factor of the test is met, specifically whether reversal of either the Confirmation Orders or the §§ 1113/1114 Orders would unfairly prejudice the rights of third parties and imperil the success of the Plans. Appellees argue that the Unions cannot sever any challenged provisions from the rest of the Plans without prejudicing numerous parties who provided consideration for the deal and third parties who have acted in reliance upon the Orders. According to the Appellees, a reversal on appeal would undermine hundreds of parties who contracts or leases have been assigned to the Purchasers, as well as the lenders who provided the $245 million in credit facilities that facilitated the capitalization of ICG.

The Unions nonetheless argue that there is relief available to the Trustees if their appeals are successful, and further, that the only innocent third parties who might be harmed by the requested relief are the unsecured creditors, who were all parties to the bankruptcy who were on notice that the Bankruptcy Court's ruling

-22-

could be reversed on appeal.[11]  The Court disagrees.

Specifically, the Unions maintain that the Court could grant two forms of relief should they prevail in their appeal of the Confirmation Orders.  In support of their argument, the Unions cite case law holding that where a Plan still controls the actions of the liquidating trustee, the case is not moot, so long as the court can provide effective relief. *Bennett v. Gemmill* (*In Re Combined Metals Reduction Co.*), 557 F.2d 179, 194-95 (9th Cir. 1977).  First, the Unions maintain that the Court could vacate the portion of the Confirmation Orders purporting to exempt the Liquidating Trustee from complying with the Coal Act.  Because the Liquidating Trustee is responsible for liquidating over 600 avoidance actions (with an estimated gross value of approximately $387,000,000.00, and an estimated net recovery between $38,000,000.00 to $77,000,000.00) the Unions argue that distribution from those proceeds could provide the Unions with some partial relief.  Second, the Coal Act Funds argue that the Court could vacate the portion of the Confirmation Orders stating that professional fees are not subject to disgorgement, which could provide another source of partial relief.

---

[11]     Moreover, the Coal Act Funds suggest that the class of unsecured creditors as a whole voted against the plans.  As correctly pointed out by Appellees, the only reason the unsecured creditors voted as a whole against the Plans was due to the negative votes of the Unions because the Coal Act Funds were voting as unsecured creditors.

In determining whether to dismiss an appeal of a confirmation order, the court should focus on whether the plan has been substantially consummated at the time of the appeal, and if so, whether "piecemeal modification of the bankruptcy plan is possible or desirable." *Bennett, supra* at p. 2 (unpublished table decision) (holding that substantial consummation rendered debtor's post-confirmation appeal moot). To the extent that the Unions seek to reverse the Confirmation Orders, the Court concludes that reversal is not possible or desirable. The Bankruptcy Court determined that the Chapter 11 plan reflects a highly integrated settlement among various constituencies, including the individual secured and unsecured creditors, Deutsche Bank, second and third-tier secured creditors, the Creditors' Committee, federal, state and local governments, surety companies, and real and personal property lessors. Reversal of the Confirmation Orders at this juncture would require the invalidation of good-faith transfers made pursuant to the Plans and would upset the reliance interests of third parties.

Nor is piecemeal modification of the Confirmation Orders a suitable alternative. Although the Unions assert that relief is possible, the Court disagrees. The Liquidating Trustee has already filed 600+ avoidance actions against third parties on a consolidated basis, and settlements have been reached with certain defendants. The Court agrees that it would be impossible to re-analyze and re-file

-24-

all 600 complaints on a Debtor-by-Debtor basis, given that the statute of limitations for avoidance actions under § 546(b) of the Bankruptcy Code expired on November 14, 2004. The avoidance actions would be lost and the Liquidating Trustee would be left without the assets transferred to it as part of the negotiated settlements. Moreover, the Court believes that allowing the disgorgement of professional fees would have an impact on third parties.

Given that the Unions did not obtain a stay, the Plans have been substantially consummated, and the relief requested by the Parties would affect the rights of parties not before the Court, the Court concludes that modification of the Confirmation Orders is both impossible and undesirable.

The Unions also argue that this Court still can provide relief that will not upset the reliance interests of third parties should they prevail in their appeal of the §§ 1113/1114 Orders. First, Appellants assert that the Court can grant some relief in the § 1113 appeal. Specifically, Appellants maintain that if the Court determines that the Bankruptcy Court erred in granting the § 1113 motion to reject the CBAs, damages resulting from the sale in violation of the successorship clause would be damages for a post-petition breach of contract and would be entitled to priority as an administrative expense. In the alternative, they argue that claims could attach to the $10,000,000.00 proceeds of the sale of the Union operations to

-25-

A.T. Massey to the extent that they are not consumed by liens or senior interests.

With regard to the § 1114 Order, the Unions argue that the Court could grant relief in the form of damages in the amount of benefits or premiums incurred during the period from September 1, 2004 (when the Bankruptcy Court permitted the Debtors to terminate payments to their individual employer plans) to September 30, 2004 (when the sale was consummated). According to Appellants, the Court can require the Debtors to make payment to their individual employer plans (or the roughly equivalent 1992 Coal Act premiums) for that one-month period, a total of approximately $1 million, and it will not undo the sale or the plans.

In contrast, Appellees deny that is possible to grant any relief to the Unions in their appeals of the §§ 1113/1114 Orders, without prejudicing third parties and requiring a redistribution of proceeds. Specifically, Appellees argue that the Debtors cannot be required to continue providing benefits because they have dissolved. Moreover, the assets have already been transferred without the obligations, and even in the absence of the §§ 1113/1114 orders, were stripped of the obligations by the free and clear sale. Appellees point out that the Liquidating Trust cannot reorder and redistribute the Sale proceeds because the sale proceeds have been distributed as provided for in the Plans. In other words, the estate does

not have the money to pay employee and retiree benefit claims.  Moreover, an

alternative distribution of the sale proceeds would cause the Plans to become un-

confirmable, and would force the matter into a Chapter 7 liquidation, thereby

reducing recovery for all creditors, including the Unions.  In sum, Appellees

contend that "the egg cannot be unscrambled"

      The Court agrees and finds that it cannot grant the relief requested.  The

Bankruptcy Court made specific findings with regard to the repercussions of not

granting the relief requested by the Debtors in the §§ 1113/1114 Orders:

> The unrefuted evidence before the court is that the debtors' assets
> cannot be sold subject to the collective bargaining agreements and
> retiree benefits, or cannot be sold subject to those obligations for a
> price sufficient [t]o pay administrative expenses or otherwise
> consummate the proposed Chapter 11 plans.  The debtors have
> engaged in active efforts to sell the assets subject to the obligations,
> but no such offers have been received and none are anticipated...In
> short, the court finds credible the testimony that the plans cannot be
> confirmed or consummated absent the relief sought by the Union
> Debtors and the other movants seeking relief under § 1114,
> particularly in that no contrary evidence was introduced.  The debtors
> have carried their burden of showing that, absent the rejection of the
> collective bargaining agreements and the proposed modifications of
> the retiree benefits, conversion of these cases to Chapter 7 and a
> piecemeal liquidation would ensue.

      Again, the Court notes that, findings of fact, whether based on oral or

documentary evidence, shall not be set aside unless clearly erroneous, and due

regard must given to the opportunity of the bankruptcy court to judge the

credibility of the witnesses. Fed. R. Bank. P. 8013. The Court concludes that the Bankruptcy Court's findings that the Plans could not be confirmed or consummated absent the relief sought through the §§ 1113/1114 Orders is supported by substantial evidence of record. As pointed out by the Appellees, the Unions have produced no evidence to the contrary.

Moreover, the Court finds that allowing the Unions, at this juncture, to convert pre-petition claims into post-petition administrative claims would essentially result in surcharging the liquidating trustee with $100 million in Coal Act premiums. Further, post-petition breach of contract claims would render the estates or Trustee administratively insolvent, thereby constituting a collateral nullification of the confirmed Plans without regard for the consideration and compromises made by administrative and unsecured creditors, including thousands of trade vendors, lessors, and service parties not before the Court.

The Court agrees with Appellees that the §§ 1113 and 1114 appeals constitute an improper request for piecemeal modification of the substantially consummated Plans, which is neither possible nor desirable. In *In re Blue Diamond, supra,* the court dismissed as moot an appeal of a § 1113 order authorizing rejection of CBAs because the plan had been confirmed and substantially consummated. *In re Blue Diamond, supra,* at 575. The court was of

-28-

the opinion that effective relief was no longer available to the Union "as a result of the comprehensive changes brought about by confirmation and implementation" of the plan of reorganization. *Id.* at 576. The court also noted the "chaotic situation that would result" if it remanded the case to the Bankruptcy Court. *Id.*

Moreover, the Court finds *In re US Airways Group, Inc.*, 369 F.3d 806, 808-809 (4th Cir. 2004) to be analogous. In *US Airways*, a pension plan appealed from an unstayed order of the bankruptcy court terminating the debtor's pension pan (the "Termination Order"). *Id.* While the pension plan's appeal of the Termination Order was pending, the debtor's plan was substantially consummated. *Id.* at 809. The district court therefore dismissed the appeal of the Termination Order as moot, stating that:

> [W]e cannot see how the requested relief – reversal of the termination
> order – could be granted without undoing U.S. Airways'
> reorganization plan and without adversely impacting the interests of
> third parties who have relied upon the consummated confirmation
> order...What is done cannot now be undone. It is simply too late in
> the day to unwind the intricate series of transactions that has occurred
> in the reorganization process in order to grant the requested relief and
> revive the pension plan."

*Id.* at 810-11.

For the reasons stated *supra*, the Court concludes that the §§ 1113/1114 orders are fundamental to the Plans because the Plans could not be confirmed but

-29-

for those orders. Because the §§ 1113/1114 Orders are integral to the Reorganization Plan's formulation and acceptance, they cannot be severed for separate consideration from the entire plan. The Court is of the mind that such piecemeal modification is neither possible nor desirable.

The Court finds that the Unions' unwillingness to post bond and thereby obtain a stay led to the substantial consummation of the Plans. Further, no relief can be effected at this juncture without upsetting the plan and affecting third parties, including the unsecured creditors who provided consideration for the deal. The Court therefore concludes that the Union appeals from the entry of the Confirmation Orders and §§ 1113/1114 Orders are equitably moot.

*CONCLUSION:*

Accordingly, because the Court is without the ability to provide the relief requested and based on the reasoning and citation of authority set forth above, the Court sustains Appellees' Motions to Dismiss. These appeals are hereby dismissed as statutorily and equitably moot.

**ACCORDINGLY, IT IS HEREBY ORDERED AND ADJUDGED THAT:**

(1) the Appellees' Motions to Dismiss [Record Nos. 37, 39, 45] are

-30-

**SUSTAINED**; and,

(2) a Judgment in favor of Appellees shall issue contemporaneously

herewith.

This 16th day of August, 2005.


Henry R. Wilhoit, Jr.
Senior U.S. District Judge